Todd M. Schneider (SBN 158253)
Matthew S. Weiler (SBN 236052)
Raymond S. Levine (SBN 348030)
Braden R. Leach (SBN 348871)
**SCHNEIDER WALLACE**
**COTTRELL KIM LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DARIUS DAVIS,<br><br>*Plaintiff*,<br><br>v.<br><br>AMAZON.COM, INC.; AMAZON.COM SERVICES, LLC; and AMAZON LOGISTICS, INC.,<br><br>*Defendants*. | Case No.<br><br>**CLASS-ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I. Nature of the Case .......... **Error! Bookmark not defined.**

II. Parties .......... **Error! Bookmark not defined.**

III. Jurisdiction, Venue, and Commerce .......... 7

IV. Amazon's Delivery Service Partner Program Creates Monopsony Power. .......... 9

A. Amazon Launches the DSP Program, Creating a Captive Seller. .......... 9

B. Amazon Controls DSPs to Maintain Its Monopsony. .......... 11

C. Through the DSPs, Amazon Controls the DSP Delivery Drivers. .......... 13

V. Neither DSPs nor Their Drivers Have Reasonable Alternatives to Serving Amazon .......... 14

VI. Amazon Exercises Monopsony Power by Imposing Substandard Compensation and Terms on DSPs and DSP Employees. .......... 17

A. Amazon Imposes Monopsony Power on Drivers Through the DSPs. .......... **Error! Bookmark not defined.**

B. DSPs Impose Amazon's Monopsony Power on DSP Drivers. .......... **Error! Bookmark not defined.**

VII. Amazon Dominance Prevents Competition That Would Limit Amazon's Power .......... 19

A. Amazon Suppresses Unions that Would Limit Amazon's Monopsony Power .......... 20

1. Edison, New Jersey: The Threat of Termination .......... 20

2. Queens, New York: Escalation and Termination .......... 20

B. Amazon Restricts Inter-DSP Competition for Drivers .......... 23

1. Amazon's No-Poaching Policy. .......... 23

2. Amending the Written Policy Did Not Change the Practice. .......... 24

VIII. Amazon Has Monopsony Power in the DSP Services Markets. .......... 25

A. Direct Evidence of Amazon's Monopsony Power in the DSP Services Market. **Error! Bookmark not defined.**

B. Indirect Evidence of Amazon's Monopsony Power in the DSP Services Markets .......... **Error! Bookmark not defined.**

1. DSP Services Are a Relevant Service Market............ **Error! Bookmark not defined.**
2. California Is a Relevant Geographic Market............. **Error! Bookmark not defined.**
3. Individual MSAs Are Relevant Geographic Markets. **Error! Bookmark not defined.**
4. Amazon's Market Share of DSP Services Market in Both Geographic Markets Establishes Its Monopsony Power. **Error! Bookmark not defined.**
IX. Even Under a Broader Market Definition of Last-Mile Delivery Services, Amazon Has Buyer Market Power. ........................................................ **Error! Bookmark not defined.**
X. Amazon Has Buyer Market Power in the Labor Market for DSP Drivers......................... 25
A. Direct Evidence of Amazon's Market Power in the California Labor Market for DSP Drivers in the Relevant Geographic Markets................................................ 26
B. Indirect Evidence of Amazon's Market Power in the California Labor Market for DSP Drivers.............................................................................................. 27
1. DSP Drivers Are a Relevant Labor Market................................................ 27
2. California and the Individual MSAsAre Relevant Geographic Markets..... 28
3. Amazon's Market Share in the DSP-Drivers Labor Market Establishes Its Market Power. ........................................................................................ 28
XI. Amazon's Conduct Has Many Anticompetitive Effects and Continues to Have Ongoing Impact...................................................................................................... 29
XII. Causes of Action ................................................................................................ 322
XIII. Prayer for Relief.................................................................................................. 35
XIII. Demand for Jury Trial ......................................................................................... 37

# COMPLAINT

Plaintiff Darius Davis, individually and on behalf of all others similarly situated (the "Class"), alleges as follows based on personal knowledge, the investigation of counsel, and information and belief.

## I. NATURE OF THE CASE

1. Amazon.com, Inc., along with its subsidiaries Amazon.com Services, LLC and Amazon Logistics, Inc. (collectively "Amazon"), has orchestrated a deliberate and unlawful scheme to suppress the wages of hundreds of thousands of workers across the United States. Amazon's practices force its army of delivery drivers to endure grueling and often inhumane working conditions, to earn bottom of the barrel pay. Amazon accomplishes this grim monopsony through its Delivery Service Partners ("DSPs"), horizontally oriented companies that provide delivery services for Amazon. This lawsuit seeks to hold Amazon accountable for abusing its purchase power in labor markets, known as monopsony power, in the labor market for DSP drivers (referred to internally as "Delivery Associates" or "DAs"). Amazon's orchestration of a the DSP monopsony results in lower wages and worse working conditions for the workers who provide the delivery services for Amazon products that have become ubiquitous in American neighborhoods.

2. Amazon is a monopsonist: a dominant buyer that can control the terms of payment for the services it demands. A monopsonist can pay its suppliers (workers) less and subject them to worse conditions, because they lack alternative buyers.

3. Amazon made over $77 billion in profit in 2025, in part by leveraging its power in the labor market to suppress wages for DSP drivers far below what other delivery drivers are paid.

4. Amazon has monopsony power in labor markets through the DSP delivery program it created. Amazon's DSP program imposes "Program Policies" and practices governing the terms under which Amazon purchases DSP delivery services. As discussed below, these policies and practices prioritize Amazon's corporate profits over worker welfare.

5. DSPs contract with Amazon to deliver packages to customers' homes. But DSPs are not true independent businesses that can resist Amazon's demands. Rather, Amazon created

DSPs to be creatures of Amazon, wholly beholden to, and the vehicle through which, Amazon imposes its monopsony power over delivery drivers. DSPs must rely on Amazon for various assets and infrastructure, including the software for assigning packages and designing delivery routes. To serve any other potential customer, a DSP would need to re-create that entire infrastructure, including purchasing its own unbranded vans and its own route software. Further, Amazon tries to keep DSPs relatively small to limit their bargaining power. DSP owners are more like middle managers than truly independent business owners.

6. DSPs are horizontally oriented business, and in labor markets that functioned in a healthy way they would compete with one another by recruiting DSP drivers and offering them better wages.

7. But Amazon has rigged the game. Amazon specifically designed the DSP Program to target and recruit drivers who have limited comparable job opportunities, which helps it to maintain its monopsony power.

8. Although they perform essentially the same delivery services, DSP drivers are paid less than similarly situated workers. Positions with the United States Postal Service ("USPS"), United Parcel Service ("UPS"), and Federal Express ("FedEx") (together, "traditional delivery services") are "golden ticket" jobs for DSP drivers because they pay substantially more in hourly wages. Jobs at USPS, UPS, FedEx have license requirements that DSP drivers generally cannot meet.

9. Because of its outsized market power in labor markets by virtue of its need to deliver a virtually endless supply of household goods, Amazon does not fear that its DSP drivers will leave to work for other employers, and it does not have to improve their compensation or working conditions. Instead, Amazon worries it will exhaust the supply of workers willing to accept the low wages and poor conditions, which it tracks as a risk of "deplet[ing] the available

labor supply."[1] In other words, Amazon's concern is not that competition will force it to pay more; it is that it will run out of workers to use up.

10. At any given time there are about 400,000 DSP drivers employed by thousands of DSP providers.[2]

11. In economic terms, Amazon is the sole buyer in the market for DSP services and, through its DSPs, the sole employer in the market for DSP drivers. In legal terms, the labor market for DSP drivers is a relevant antitrust market, and Amazon has monopsony power in that market. That market is national in scope. Amazon administers the DSP Program under a single set of contracts, policies, and practices that apply identically to every DSP in the country, and Amazon is the only buyer of DSP driver labor.

12. As the only buyer, Amazon exercises its power through the low compensation and poor conditions it imposes on DSP drivers. DSP drivers earn significantly less than delivery drivers for UPS, FedEx and the USPS. And DSP drivers themselves have called their working conditions "atrocities" because they must meet inhumane demands, like urinating in water bottles to satisfy inhuman delivery requirements. They must accept invasive surveillance that monitors their every movement, and face the possibility of immediate termination for the smallest infraction. Indeed, if they do anything that Amazon does not like, Amazon can effectively end their employment not just at one DSP but at all of them. Amazon can act with such impunity because of its monopsony power.

13. According to one report, Amazon DSP workers suffered injuries causing lost time at work at *more than twice the rate* of non-Amazon delivery workers.[3]

---

[1] Complaint, *New Jersey v. Amazon.com, Inc.*, No. 26-cv-9614, Dkt. No. 1, ¶ 6 (filed Aug. 4, 2026) (hereinafter "*New Jersey v. Amazon* Complaint").

[2] https://logistics.amazon.com/marketing

[3] The Strategic Organizing Center, *The Worst Mile: Production Pressure and the Injury Crisis in Amazon's Delivery System* 8 (May 2022), https://thesoc.org/wp-content/uploads/sites/342/The-Worst-Mile-1.pdf.

**FIGURE 2:** Injury Rates by Injury Category for Amazon Delivery System, Amazon DSPs, and Non-Amazon Delivery, 2021




14. Amazon implements a multifaceted strategy to maintain its monopsony power, allowing it to impose inhumane working conditions and do what it pleases with respect to compensation for DSP drivers.

15. Amazon's illegal strategy has two core components: (1) blocking DSP drivers from unionizing, and (2) preventing DSPs from competing with one another for drivers.

16. First, Amazon uses a range of anticompetitive tactics, through its control over the DSPs, to crush any prospect of DSP-worker unionization. A DSP drivers' union would collectively bargain for better compensation and working conditions that would reflect the actual value of the services that DSP drivers provide to Amazon. But Amazon fears unionization because it could force Amazon to pay more competitive rates and make costly workplace improvements. If the DSPs in one geographic area were to successfully unionize, Amazon fears that unionization would rapidly spread across the rest of the country due to the benefits that unionized workers could secure.

17. Among other tactics, Amazon obligates DSPs to adopt and enforce at-will employment policies for drivers that hinder unionization. DSPs that oppose such policies risk destruction of their business and harassing litigation from Amazon.

18. Amazon has made good on its threats and policies. It has repeatedly punished DSP drivers who have attempted to unionize. DSP drivers understand that union organizing or union support could cause their working hours to be reduced. Amazon has also terminated entire DSPs from its program after their drivers attempted to unionize. And Amazon abuses its position as a corporate behemoth, with near-unlimited resources and technological capabilities, to track and intimidate DSP drivers who seek to unionize, including, upon information and belief, capturing and analyzing surveillance videos of those who simply attempt to exercise their rights.

19. Just recently, in March of this year, a DSP in Edison, New Jersey, warned its drivers that Amazon would effectively shut it down if they attempted to unionize. This threat followed Amazon's termination of a DSP in Queens, New York, in response to attempts by its workers to unionize. The termination of the Queens DSP reportedly resulted in more than 150 drivers being fired.

20. Second, to maintain its monopsony power, Amazon has prevented or otherwise inhibited DSPs from competing with one another for drivers. If DSPs were permitted to recruit each other's drivers, then drivers' wages would increase, DSPs' costs would increase, and DSPs would demand higher compensation from Amazon. In addition, such competition among DSPs could allow some DSPs to grow more powerful and negotiate more competitive compensation and terms for the services that Amazon demands.

21. Amazon has taken specific steps to prevent this possibility—implicitly and explicitly limiting the ability of DSPs to recruit each other's drivers—in a type of no-poach agreement.

22. Initially, Amazon instituted and enforced a policy that implicitly prevented DSPs from recruiting drivers from other DSPs. Amazon's policy brazenly disregarded the law that prohibits competing employers from coordinating on offers of employment. Amazon prohibited DSPs from making the first move to recruit an employee from another DSP and defined the "acceptable" circumstances when DSPs could recruit from their competitors.

23. After Amazon realized that its no-poach policy plainly violated antitrust laws, it stopped announcing it out in the open. But, upon information and belief, the no-poach agreement remained in effect.

24. According to the Department of Justice and Federal Trade Commission's *Antitrust Guidelines for Business Activities Affecting Workers*:

> The antitrust laws protect competition for labor, just as they protect competition for goods and services that companies provide. They protect the freedom of working people to choose the best job for them and their families. Just as vibrant competition for goods and services benefits consumers, competition among employers benefits workers through better wages, benefits, and other terms and conditions for working people. Business practices may violate the antitrust laws when they harm the competitive process, especially if they deprive labor markets of independent centers of decisionmaking or they create or abuse employers' monopsony power. By interfering with free and fair competition for workers, such practices can lead to fewer job opportunities, lower wages, and worse working conditions.[4]

25. Amazon's anticompetitive conduct violates the antitrust laws, including both Section 1 and Section 2 of the Sherman Act as well as California's Cartwright Act. In a competitive market, Amazon could not unilaterally set the terms and conditions associated with the purchase of DSP services, and DSPs would be free to recruit whomever they wished without Amazon's interference. As a result of this conduct, DSP drivers have been subjected to financial, physical, and mental harm, illustrating the brutal impact of an unchecked monopsonist.

26. Plaintiff seeks treble damages for the compensation that he and similarly situated DSP drivers would have earned for their services, but for Amazon's anticompetitive conduct.

## II. <u>PARTIES</u>

27. Plaintiff Darius Davis is a resident of California. He worked as a DSP driver in Stockton and Manteca, California, and surrounding delivery routes, from 2025 to 2026. As a result of Amazon's monopsonistic and anticompetitive practices, the wages he received were lower than they would have been otherwise.

---

[4] U.S. Department of Justice and the Federal Trade Commission, *Antitrust Guidelines for Business Activities Affecting Workers* (Jan. 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/p251201 antitrustguidelinesbusinessactivitiesaffectingworkers2025.pdf (footnotes omitted).

28. Defendant Amazon.com, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of Washington. Amazon.com, Inc. engages in business across the United States, including in the State of California. Amazon.com, Inc. wholly owns and operates Amazon.com Services LLC.

29. Defendant Amazon.com Services LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in the State of Washington. Amazon.com Services LLC engages in business across the United States, including in the State of California. Amazon.com Services LLC manages key e-commerce operations for Amazon, including logistics and fulfillment services.

30. Defendant Amazon Logistics, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of Washington. Amazon Logistics, Inc. operates the DSP Program and enforces the contract terms, rules, and regulations associated with it. Amazon Logistics, Inc. engages in business across the United States, including in the State of California. Upon information and belief, Amazon.com, Inc. wholly owns and operates Amazon Logistics, Inc., either directly or through Amazon.com Services LLC. Amazon Logistics, Inc. manages last-mile delivery services for Amazon.

31. Each DSP is a separate legal entity from Amazon.

32. Each DSP hires employees, handles payroll, obtains access to and maintains vehicles, secures insurance, meets performance requirements, and takes on financial risk.

33. Accordingly, the DSPs are not a single enterprise or entity with Amazon.

## III. JURISDICTION, VENUE, & COMMERCE

34. Plaintiffs' delivery were made in the course of interstate commerce as the deliveries delivered goods Amazon had offered for sale on the Internet and purchased in national or international commerce for delivery to U.S. households.

35. Plaintiff brings this action to recover damages and obtain injunctive relief, including treble damages, costs of suit, and reasonable attorneys' fees arising from Amazon's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

36. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question) and 1337(a) (commerce and antitrust). The Court has supplemental jurisdiction over Plaintiff's state-law and common-law claims under 28 U.S.C. § 1367(a).

37. This Court has personal jurisdiction over Amazon under Section 12 of the Clayton Act, 15 U.S.C. § 22, and Rule 4(k)(1)(C) of the Federal Rules of Civil Procedure, because it is found in and transacts business within this District, is properly served, and has substantial contacts within the United States.

38. The Court also has personal jurisdiction over Amazon under Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure, because Amazon is properly served in California and is subject to the jurisdiction of California courts. The allegations in this action are a direct result of Amazon's operations within the State of California, including Amazon's last-mile delivery and fulfillment operations and Amazon's contractual relationship with DSPs within the State.

39. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)(1) and (2) because Amazon transacts business in this District and a substantial part of the events giving rise to Plaintiff's claims occurred within this District, including Amazon's last-mile delivery and fulfillment operations and its contracting and dealings with DSPs and DSP drivers.

40. Amazon engages in, and its activities substantially affect, interstate trade and commerce as those terms are used in 15 U.S.C. §§ 1 and 2. Amazon sells and distributes goods and services all throughout the United States, including across state lines and into California. Amazon operates a vast delivery network: its warehouses store products from manufacturers and distributors from all over the world, and it ships those products across state lines to customer locations in California and every other state.

41. Amazon contracts with DSPs and engages DSP transportation workers in California as part of that interstate system. Amazon purchases the services of thousands of California residents, who then deliver Amazon's goods in California and other states. The last-mile delivery services performed by DSP drivers, including Plaintiff, is part of Amazon's continuous, interstate-transportation system.

42. California hosts many Amazon fulfillment centers and other delivery operations, including major facilities in Livermore, Newark, Oakley, Richmond, and San Leandro, California, which collectively employ thousands of workers and handle substantial volumes of Amazon's logistical operations. Plaintiff understands that hundreds or thousands of DSP drivers in California are impacted by Amazon's conduct. Amazon operates delivery stations in every state, and, upon information and belief, hundreds of thousands of DSP drivers nationwide are impacted by Amazon's conduct. Amazon's multifaceted scheme directly suppresses wages in the DSP services market and limits worker mobility.

## IV. AMAZON'S DSP PROGRAM GIVES IT MONOPSONY POWER.

43. Amazon is known for its e-commerce platform, brick-and-mortar grocery stores, film and television production, consumer electronics manufacturing, cloud computing services, satellite internet services, and more. Less well known, however, is its logistic services division, which fulfills and delivers orders placed on its e-retail platform.

44. Prior to 2018, when Amazon shipped a relatively small number of packages, Amazon primarily relied on UPS, FedEx, and USPS, sometimes called "last-mile delivery" services, to deliver packages to its customers. From 2013 to 2018, the number of packages Amazon shipped in the U.S. doubled. Since 2018, that number has doubled again. Amazon's massive delivery needs have allowed it to create its own delivery system, a system that creates—and allows Amazon to exploit—its power as a buyer of package-delivery services.

45. Last-mile delivery services are one of the most complex aspects of supply-chain management. The millions of households receiving deliveries are geographically dispersed. Complex routes, local urban congestion, parking scarcity, and rural sparsity create unique challenges to delivering packages quickly and efficiently.

### A. Amazon Launches the DSP Program, Creating a Captive Seller.

46. Amazon used its power as a buyer to create an entirely new logistics chain that allows it to exploit that power. First, in 2015, Amazon created Amazon Flex, a gig-work model similar to Uber, DoorDash, or Instacart. Amazon Flex pays nominally independent contractors to

perform last-mile delivery services using the contractors' own vehicles. Amazon advertises this program as "a flexible way of earning extra money on [a driver's] own schedule."

47. With more projected growth on the horizon, Amazon announced the launch of the DSP program in June 2018. By this point, Amazon Logistics handled nearly a billion packages per year with an expectation that that number would continue to increase. Amazon's then-Senior Vice President of World-Wide Operations, Dave Clark, stated at the time, "[w]e need to build more of our own capacity." Despite this stated need, Amazon expanded its delivery capacity by creating a network of thousands of separately owned and organized DSPs.

48. Under its DSP program, Amazon directly controls a large, captured, last-mile delivery workforce through nominally separate companies, which operate between Amazon and the drivers performing the work that it demands. Amazon's public-facing and, upon information and belief, internal media-response materials show that this separation functions to shield Amazon from the costs and liabilities associated with direct employment. From Amazon's perspective, DSPs bear the maximum risk of tort liability. The DSP program protects Amazon from risks and lowers its costs at the expense of the DSPs and their drivers. Further, Amazon's rates and operating requirements sharply limit the DSPs' ability to compete for drivers through better wages or working conditions—an outcome made possible by Amazon's monopsony power.

49. Publicly, Amazon claims that it created the DSP program "to share our experience in operations and logistics with aspiring entrepreneurs." In fact, the program shields Amazon from liability associated with deliveries, including liability resulting from injury and death, shifting the risk to the DSP and making it less attractive to entrepreneurs.

50. Despite such critiques, Amazon has not adjusted any of its program terms—the mark of a monopsonist with no competitive pressure to do so. Amazon recently described DSP ownership as an opportunity to become "the owner-operator of your own business," not mentioning entrepreneurship. Whereas entrepreneurs wish to expand and scale their businesses or develop entities that can be sold for profit, owner-operators simply act as the managers of "their" small businesses, running daily operations. Effectively, Amazon designed the DSP Program so that DSPs are middle managers by another name.

51. In the first year of operations, Amazon signed nearly 180 DSPs. The program expanded rapidly, and by 2024, Amazon had grown the network to 4,400 DSPs operating across 19 different countries. Today, Amazon delivers the vast majority of its packages through DSPs.

**B. Amazon Controls DSPs to Maintain Its Monopsony.**

52. Amazon's DSP Program is a pivotal component of its last-mile delivery strategy. Essentially, Amazon recruits "independent contractors" to deliver Amazon packages. Each DSP is an individually registered legal entity that contracts with Amazon.

53. Each DSP is required to sign a DSP Program Agreement with Amazon. Under those agreements, DSPs are prohibited from disclosing the parties' terms, and DSP owners are prohibited from owning stakes in multiple DSP entities, among other requirements.[5]

54. Amazon's goal is to have an entire class of workers and DSP entities wholly dependent on Amazon's workflow under the terms that Amazon mandates. Amazon maintains near-absolute control over DSPs and their drivers through rigid enforcement of contractual terms, "suggestions" made by Amazon-imposed business coaches, and the Operations Manual, all of which are functionally mandates.

55. Amazon bases DSP compensation on: (1) a monthly base rate paid per vehicle, based on the size of the fleet that Amazon itself determines that the DSP needs, with this size subject to change each month; (2) a weekly hourly base rate based not on the hours actually worked, but on the hours that Amazon estimates the assigned routes will take; (3) an additional payment paid per successfully delivered package; and (4) a fuel allowance paid directly to a DSP's fuel card vendor. Because the first three factors are all dependent upon the routes that Amazon assigns to a DSP, each DSP's profitability is squarely within Amazon's discretion.

56. DSPs commonly lease and use Amazon-branded trucks and vans, and the DSPs' employees wear Amazon-branded clothing. Amazon imposes the terms and conditions for those leases. Although DSPs are responsible for the rates and compliance with lease terms, Amazon

[5] *See Fli-Lo Falcon LLC v. Amazon.com, Inc.*, Case No. 2:22-cv-00441-RSM-MLP, Dkt. No. 33-2 at 2–3, 5 (filed June 17, 2022) ("Amazon Logistics Delivery Service Partner Program Agreement").

prohibits DSPs from using the vans for anything other than delivering Amazon packages. Further, if a DSP is terminated or quits the program, that DSP must return the vehicles. Employees wearing Amazon uniforms may deliver only Amazon packages. To the customer, there is no discernible difference between a DSP employee and an Amazon employee.

57. The overwhelming majority of DSPs exclusively deliver Amazon packages, and Amazon knows that canceling its contract with a DSP will functionally destroy the business and, thus, the DSP owner's investment. Amazon's level of infiltration, integration, and control over DSPs' operations is indispensable; a DSP cannot survive the process of extracting itself from Amazon's infrastructure.

58. Each DSP Program Agreement incorporates by reference Amazon's "Program Policies." Among those terms, Amazon requires all DSPs to maintain an at-will employment policy for DSP drivers, which, by its terms, prevents DSPs from allowing workers to unionize. This "yellow-dog contract" functionally prohibits DSPs from employing unionized drivers.

59. Each DSP also receives "The Operations Manual." The Operations Manual does not clearly distinguish which of its terms are binding policies and which are merely advisory. This ambiguity further illustrates Amazon's monopsony power: in a competitive market, suppliers would be able to demand transparency as to which terms and conditions were contractually binding and thus effectively required for the DSP's business to survive.

60. Amazon also assigns a "Business Coach" to each DSP. Business Coaches are employees of Amazon, not DSPs; they act as liaisons and intermediaries between DSPs and Amazon. Business Coaches oversee DSP onboarding, compliance, and quality assurance of DSP services.

61. DSPs are entirely beholden to Amazon. To begin with, Amazon automates and runs many aspects of the DSP's business operations. Amazon largely controls the hiring and training process. Amazon has constant control of DSPs' vehicles. Amazon assigns packages and routes through the Amazon Flex app to individual drivers employed by the DSPs and unilaterally sets performance goals and ratings for DSP drivers. The DSP can access such systems only in

connection with providing delivery services to Amazon. This limits DSPs' ability to provide their services to any buyer but Amazon.

62. Because DSPs depend on Amazon for critical business infrastructure, Amazon is the only potential purchaser of DSP services. A DSP would need to replicate that business structure, essentially creating a separate business, to deliver packages for anyone besides Amazon. It would need a second set of vans and employees, its own software or logistical systems, and hiring and training processes to be able to serve any customer besides Amazon. Amazon created a system in which it is the only buyer—the quintessential monopsonist—whereas traditional delivery services like FedEx and UPS serve a much wider audience.

**C. Through the DSPs, Amazon Controls the DSP Delivery Drivers.**

63. As a monopsonist, Amazon's control extends beyond the DSPs to the drivers that they employ. Drivers begin their day on Amazon's app and end their day with Amazon's score on the same app. Drivers report through Amazon software, drive Amazon-branded rented vans, follow Amazon-designed routes, receive Amazon performance scores, and face discipline driven by Amazon's rules.

64. Amazon oversees DSPs' hiring through the DSP job hub, an Amazon website where most of the hiring for the program occurs. According to drivers, opportunities for Delivery Associates appear to be for jobs at Amazon itself, not with DSP contractors. Amazon must approve every DSP hire, and candidates who are invited to attend job fairs or hiring events are not informed of the name of the DSP where they will be nominally employed until the hiring decision has been made. Amazon exercises little discernment in hiring generally, but it will apply stringent standards on drivers attempting to work at a different DSP if they have been labeled as union "agitators" at their prior DSP.

65. Moreover, Amazon can and has prevented DSP drivers from working for a DSP, even without that DSP's permission or knowledge. Indeed, while Amazon claims that DSP employment decisions are within the purview of the individual DSPs, Amazon maintains the ability to offboard any potential employee currently in the onboarding pipeline.

66. Amazon's control over DSPs and their employees does not end with hiring decisions. Amazon exercises control over DSP employees after they are onboarded, and it can suspend DSP drivers against the express wishes of the DSPs. For example, in November 2024, an anti-union consultant hired by Amazon used a homophobic epithet against a DSP driver. That evening, the DSP told the driver he would be suspended while the incident was investigated. And though the DSP cleared the driver to return the following day, Amazon security continued to bar him for working for approximately two weeks.

67. Amazon also tracks lateral driver movement between DSPs. From the intelligence it collects, Amazon can directly monitor whether and where there is competition for drivers amongst DSPs.

68. Amazon also dictates every aspect of a driver's performance. In addition to assigning routes, Amazon records and tracks certain metrics for each driver, which are used to determine if a driver should be penalized or terminated. If a driver does not achieve certain performance metrics, they can lose routes and thus lose compensation.

69. Amazon engages in constant surveillance of DSP drivers using AI-assisted cameras installed in their delivery vehicles. These cameras record and report any potential infractions committed by a driver, despite the lack of clear policies on what exactly constitutes an infraction. Further, Amazon uses its ambiguous policies to punish DSP drivers who challenge its monopsony power by, for instance, attempting to unionize with their fellow drivers.

70. But the surveillance is not limited to cameras in delivery vehicles. Amazon has gone so far as to deploy drones to record and surveil DSP drivers attempting to strike, such as the drivers who attempted to unionize in Queens, New York, as discussed in greater below. These drones recorded the participants of the strike—footage which Amazon then used to identify and blacklist participating drivers. It was also reported that Amazon stationed extra security cameras at its facility in Queens in anticipation of the strike.

## V. <u>NEITHER DSPS NOR THEIR DRIVERS HAVE REAL ALTERNATIVES.</u>

71. DSPs have little leverage against these rules. Because losing the Amazon contract would very likely mean the end of the business, DSPs cannot meaningfully resist Amazon's

compensation-information restrictions, anti-union requirements, or other driver-facing policies. DSPs are captive agents through which Amazon enforces the terms it sets.

72. DSPs depend on Amazon for their services and operating infrastructure. Many have no customers other than Amazon and no independent delivery volume. If a DSP wanted to source to a non-Amazon buyer, it would need its own vehicles, its own payroll-processing system, and software to manage scheduling and delivery.

73. UPS and the USPS do not rely on independent contractors for their core business. And DSPs do not have the infrastructure required to operate at the capacity that FedEx requires of its contractors. For example, a FedEx Independent Service Provider (ISP) business requires an investment of $300,000 to $1.5 million, whereas a DSP business requires $30,000 in liquid assets and roughly $10,000 in startup costs—an order of magnitude less. In part, the costs are higher because the FedEx ISP must purchase a route. To become a FedEx ISP, an Amazon DSP would likely have to buy a new fleet of delivery vehicles, given that the Amazon vehicles that most DSPs use can only be driven to deliver Amazon packages. In sum, none of these traditional delivery services are reasonable alternative customers for DSPs.

74. Under each DSP Program Agreement, Amazon is given extremely wide latitude—at least eight different options—to terminate the Agreement. Upon information and belief, termination inevitably results in dissolution of the DSP.

75. Like their DSP employers, DSP drivers have no reasonable alternatives to their existing jobs. Drivers that seek employment with DSPs prioritize regular, full-time work, and immediate start dates, which are typically unavailable to them elsewhere. Amazon attracts applicants with the promise of a 40-hour work week while maintaining power over these workers through its policies, practices, and a pervasive culture of fear.

76. More specifically, working for other last-mile delivery providers is not a reasonable alternative. Although UPS, USPS, and FedEx Ground hire drivers to deliver packages, the labor arrangement is fundamentally different. Critically, for the workers that Amazon recruits, the hiring channels at traditional delivery services are different from Amazon and present unique challenges. USPS and UPS have different hiring processes that create barriers for Amazon DSP drivers; both

are unionized, for instance, and USPS is a civil service system with its own requirements and procedure. Even if these companies, individually or together, were an option for DSP drivers, such an option would only be meaningful if an employer were hiring when a DSP driver was looking for work and the employer selected the DSP driver. Furthermore, traditional delivery services do not hire enough new delivery drivers to be a competitive constraint on Amazon's buyer power.

77. Indeed, according to research from the Harvard Kennedy School:

- Mean hourly wages are significantly lower for delivery workers at Amazon than at UPS and FexEx. Wage gaps are especially large between the delivery workers at Amazon ($19/hr) and the unionized drivers at UPS ($35/hr).

- Unionized UPS drivers have a clear pathway to upward mobility and Amazon drivers do not. At UPS, wages increase sharply with job tenure, starting at $21/hr and reaching nearly $40/hr for the more than half of all UPS drivers who have been with the company for at least ten years. At Amazon, wages start at $17/hour and don't increase with tenure, and nearly half of workers have less than a year on the job.

- Between lower wages, more unstable schedules, and fewer fringe benefits like employer-sponsored health insurance, paid sick leave, and paid vacation, Amazon drivers struggle to make ends meet. 26% report a time in the last month when they were hungry because they couldn't afford enough to eat and 33% report an inability to cover utility bills. Amazon drivers stand out as uniquely precarious.

- Amazon drivers, like workers in Amazon fulfillment centers, are subject to intense workplace surveillance and speed tracking. 60% of both Amazon drivers and fulfillment center workers reported a leaderboard at work, 60% of both groups received frequent feedback on the speed of their work from a technological device, and more than two-thirds say that their employer monitors the quality of their work using technology. That degree of technological surveillance and tracking far outpaces what UPS and FedEx workers are exposed to.[6]

78. Although UPS will, at times, hire seasonal delivery drivers, these jobs are substantially limited and not permanent. Under the national UPS collective bargaining agreement,

---

[6] Daniel Schneider, David Weil, Julie Su, & Kevin Bruey, *Amazon Drives Low Wages: The Unraveling of Workplace Protections for Delivery Drivers*, Harvard Kenney School (Oct. 2025).

UPS may only hire seasonal employees between November 15th and December 26th, and priority for seasonal driving positions is given to existing part-time employees and other "temporary cover" drivers, *i.e.*, employees with non-driving positions who may fill in as needed.

79. With other last-mile delivery providers, the time between hiring and the start date can be long and uncertain. In contrast, DSP hiring occurs quickly. Many DSP drivers lack the means to wait out a more extended process; therefore, the DSP Program captures a differentiated class of workers from those who work in the "golden ticket" positions offered by traditional delivery services. DSP drivers are effectively an underclass.

80. These same market factors explain why DSP drivers typically add gig work on top of their DSP work instead of completely switching from DPS work to gig work. DSP work and gig work serve different functions. DSP work offers more predictable hours and a more regular schedule. And unlike gig drivers, DSP drivers are not required to have or use their own vehicles.

81. In other words, Gig work is not a substitute for DSP drivers. DSP drivers do not commonly leave DSPs for Uber, Lyft, or DoorDash; they generally remain in the DSP job and add gig hours on the side.

## VI. <u>AMAZON EXERCISES MONOPSONY POWER BY IMPOSING SUBSTANDARD COMPENSATION AND TERMS ON DSPS AND DSP EMPLOYEES.</u>

82. Because Amazon faces little to no competition when purchasing DSP services and hiring DSP drivers, it can and does impose anticompetitive terms and compensation on DSPs. That, in turn, requires DSPs to suppress wages and impose worse working conditions on their drivers. Amazon imposes rates unilaterally, which stay flat while operating costs increase, leaving DSPs with thin margins. Amazon further imposes surprise fees and costs, such as bills for van repairs that can exceed $100,000.

83. Amazon can and does assign lower-than-expected volumes of routes, as well as route variability, which affects DSP compensation. The DSP "scorecard" metrics, which Amazon uses to justify the number of routes given to each DSP, remain opaque to the DSPs themselves. Further, the metrics that Amazon imposes may themselves be contradictory.

84. Amazon micromanages DSPs, even though they are ostensibly independent businesses. For example, DSPs are penalized for driver turnover, regardless of the basis for terminating an employee.

85. Whether wittingly or unwittingly, DSPs then impose lower wages and worse conditions than they would if there were competition. DSP workers receive substandard compensation, and they must comply with unreasonable, and at times inhumane, conditions, accept imperious and byzantine oversight, and attend mandatory meetings without pay.

86. For instance, DSP drivers understand that DSP driving, "both delivery and warehouse, [is] designed to push people to their max and have them quit with in two years."[7] One driver took to Reddit to note:

> [T]his job, in its current form, is absolutely ridiculous. You'll read from others about their stops and find yourself saying, "oh, I only have 175 stops today. Not too bad!" BUT THATS A FUKING LIE!. You have to, all of you, start looking at your locations. I was doing an average of 280+ stops daily. With anywhere between 300 to 400+ packages each route. To do all of that while maintaining proper procedures and getting done in the "recommended" time frame is extremely taxing not just on the body but on the mental as well. Pile on top of the demanding physical nature of the job, you're also going to be dealing with unsafe vans (missing mirrors, broken backup cams, doors not closing, heat/ac not working, etc) dirty work environment (piss bottles, feces in totes, trash, sticky substances, etc) and sometimes, depending on where you work, unsafe neighborhoods.[8]

87. To meet Amazon's grueling delivery requirements, DSP drivers must regularly relieve themselves using water bottles kept in their delivery vehicles. One driver noted: "Every single person [they] have had the chance to ask, has stated they pee in bottles all day. There's more women than men at my DSP. They are all peeing in bottles. Anyone who says that peeing in bottles is not an expected mechanic of this business model is a liar."[9]

88. DSP drivers also observe that Amazon tries to avoid paying for injuries resulting from its sub-competitive working conditions. One driver noted that, "if you get hurt they

---

[7] *See* https://www.reddit.com/r/AmazonDSPDrivers/comments/142zbnj/is_the_job_really_that_bad/ (last accessed Aug. 24, 2026).

[8] *Id.*

[9] *See* https://www.reddit.com/r/AmazonDSPDrivers/comments/16hjg9r/pee_bottles/ (last accessed Aug. 24, 2026).

[Amazon] will do anything to ensure that you are footed the bill rather than let workman's comp insurance take care of it. So it's more like 'Yes, we're not only fucking you, paying you to better yourself while we're fucking you, but if you get hurt on the job and agree to workman's comp we'll make sure just days away from surgery we'll plant someone next to you while on desk duty for medical leave to record your conversations that when you wake up in the hospital you'll find that you were footed the bill as we'll twist the facts about your ability to recover while we're fucking you as well.'"[10]

89. Further, DSP drivers legitimately fear that an act as ubiquitous as rolling through a stop sign could result in termination, despite their best efforts. To DSP drivers, Amazon's "rules" often seem like moving targets, because they can be unannounced, carry uncertain penalties, and can be used as pretext to terminate a driver for an unrelated reason that Amazon does not wish to disclose, such as attempted unionization.

90. As a result, DSP drivers feel forced, trapped, or even subhuman and unworthy of better benefits. DSP drivers have described working conditions as "atrocities," "disgusting," "slave labor," "inhumane," and "subhuman." Relatedly, when one DSP raised vehicle-safety concerns, Amazon told the DSP that it still had to run the route. When the same DSP complained to Amazon's corporate ethics line, Amazon cut its routes.

## VII. AMAZON PREVENTS COMPETITION THAT WOULD LIMIT ITS POWER.

91. The primary threats to Amazon's dominance over DSPs and their employees are unionization and worker mobility. First, absent Amazon's policies and actions, DSP drivers would have a fair opportunity to organize the DSP workforce. If faced with a true possibility of DSP organization, Amazon would either have to improve conditions for their workforce to convince workers not to unionize, or DSP workers would unionize and could negotiate better terms and conditions of employment. In either event, Amazon would lose its absolute power over DSPs and DSP drivers. Second, absent explicit and implicit policies that prevent DSPs from hiring drivers away from each other, DSPs in need of drivers could offer better pay, and workers could switch

[10] *See* https://www.reddit.com/r/AmazonDSPDrivers/comments/1bfflyz/how_do_yall_survive_on_these_wages/ (last accessed Aug. 24, 2026).

employers. Competition at the DSP level would increase wages and reduce Amazon's ability to pay below-competitive levels for DSP services.

92. But Amazon uses its monopsony power to prevent competition. The restrictions Amazon imposes, in conjunction with the anticompetitive conduct discussed below, maintain and enhance Amazon's monopsony power over DSPs.

**A. Amazon Suppresses Unions that Would Limit Amazon's Monopsony Power.**

93. Amazon's opposition to unions is well-known. Although Amazon is adamant that DSP drivers are *not* Amazon employees, it is nevertheless intent on preventing unions from forming at DSPs.

94. Amazon tracks DSP drivers' attempts to unionize through its sophisticated surveillance apparatus. Upon information and belief, Amazon then discourages unionization through the DSPs. Amazon supplies the template, materials, and coordination; DSPs deliver the message.

95. Amazon's union-prevention tactics follow a typical path. Amazon tracks the potential organizing, brings the routine response, and, if the routine fails, ends the relationship with the DSP. Amazon goes from surveillance, to messaging, to dissolution.

**1. Edison, New Jersey: The Threat of Termination**

96. At one mandatory workforce meeting in Amazon's Edison, New Jersey delivery station, a DSP owner told workers that organizing could endanger the operation of the DSP. The owner illustrated the point by referencing Amazon's recent decision, as the owner described it, to substantially reduce the package volume Amazon previously routed through UPS, which led to layoffs at UPS. The clear implication was that Amazon would not renew a DSP's contract if its drivers organized. The message communicated to workers was that the DSP's continued access to routes depended on avoiding union activity. The Edison warning did not arise in a vacuum: as described below, Amazon formulates anti-union messaging, supplies it to DSPs for dissemination to their drivers, and monitors each DSP's delivery of that message. Threatening the end of a DSP's business preserves Amazon's monopsony power.

**2. Queens, New York: Escalation and Termination**

97. When its normal playbook is unsuccessful in suppressing organizing actions, Amazon escalates. These tactics are illustrated by Amazon's treatment of workers at its DBK4 delivery station facility in Queens between January 2024 and August 2025.

98. At the DBK4 location, union organizers built majority support across three DSPs. Drivers delivered a written demand for recognition to Amazon and the DSPs.

99. In November 2024, Amazon deployed third-party consultants to intimidate the organizers and other prospective union members through proximity and workspace invasion. Some consultants wore the safety vests that Amazon issues to its own field staff. The consultants appeared at morning standup meetings, pulled drivers into small-group sessions, and rode along on routes while presenting themselves as operational support. DSP workers understood the consultants were acting on Amazon's behalf. Their presence and surveillance had a chilling effect on DSP workers' exercise of protected labor rights, serving Amazon's purpose to intimidate.

100. On December 19, 2024, at DBK4, approximately 200 workers went on strike, 87 of which worked for the DSP called Cornucopia Logistics, LLC. The strike lasted approximately from December 19 until December 24. Ninety-nine percent of workers at the lead organizing DSP voted to strike, and workers at twenty-six driver units across ten Amazon locations demanded recognition that week.

101. In response to these organizing efforts, Amazon brought a security apparatus to the organizing campaign, including aerial drones overhead, police barricades at the gate, and additional cameras inside the building. The sequence, as workers confirmed, was as follows: monitor organizing, deploy consultants, reduce routes, terminate workers, and then terminate the DSP.

102. Amazon refused to increase compensation for DSP drivers or improve working conditions. Instead, after Christmas, Amazon reduced routes assigned to a DSP at which drivers were successfully organizing. Non-strikers continued to receive routes, but strikers were sent home without pay. A week later, the DSP's manager laid off thirty workers, mostly strikers. The DSP told its workforce, in substance, that Amazon had directed the cuts: "Amazon doesn't trust us now" and "Amazon took routes away because you went on strike."

103. The layoffs affected organizing beyond Queens. One Queens DSP also operated at another facility in the same metropolitan area, and workers understood the retaliation at one facility to chill organizing at others.

104. Yet, workers at DBK4 rebuilt support over the next eight months. On August 12, 2025, drivers for Cornucopia raised route-reduction concerns at a standup meeting. Drivers argued to Cornucopia management that the DSP was reducing routes for incumbent employees—including those that had participated in previous strike actions—while continuing to onboard new employees. On August 20, following a typical workday, Cornucopia employees were informed that the DSP's contract had been terminated and that drivers did not need to report to DBK4 on August 21. Amazon cut the DSP's contract with no notice, terminated two of its operations, and redeployed its branded vehicles to other DSPs.

105. According to one employee, the Cornucopia owner stated that the termination "had nothing to do with Cornucopia's quality or safety." Further, in the months preceding the termination of the contract, Cornucopia managers informed drivers during morning standup meetings that that the DSP was rated "Fantastic Plus" by Amazon, the highest rating for a DSP. Cornucopia's manager stated that the "strike was major" in Amazon's determination to terminate the DSP.

106. Amazon also blacklisted individual workers identified as supporting unionization. One worker visible in the campaign was rejected at seven other DSPs in New York and New Jersey. Another found work at a different DSP, which fired the worker within weeks of its manager learning the worker's previous place of employment. A third was hired through a personal referral and then terminated when the manager learned of the worker's prior union efforts.

107. Queens was not an isolated incident. The same anti-union messaging appeared across DSPs and facilities. Workers received template text messages in which DSPs occasionally forgot to substitute the correct DSP's name into the template. Similar posters appeared in different locations, and similar scripts were delivered at standup meetings across legally separate DSPs.

Independent small businesses do not produce identical messaging at scale by coincidence. The anti-union messaging was formulated and provided to DSPs by Amazon.

108. DSPs and their drivers understand that dissolution can be the penalty for defying Amazon. Indeed, DSP drivers have noted that, "even if a DSP successfully unionized, all it would take is Amazon to not renew the contract with the DSP. DSP goes out of business, no more union to worry about."[11] Typically, "there are multiple DSPs serving the same distribution station, so if one DSP strikes there are still 2 or 3 still working, and the DSP can also be replaced like underwear. No one is safe DSPs included, union proof."[12]

### B. Amazon Restricts Inter-DSP Competition for Drivers.

109. Collective action is one major threat to Amazon's buyer power. Worker mobility is the other. Competition among DSPs for drivers would typically be the main mechanism to increase wages and other forms of compensation. A DSP that needed drivers could offer better pay or better working conditions, inducing workers at other DSPs to either switch employers or use this offer to negotiate a higher counteroffer with their current DSP employer. In either case, competition among DSPs would increase wages or improve working conditions, which would then place competitive pressure on Amazon to pay higher rates for DSP delivery services. Amazon has used its power to constrain that possibility—first through written policy, later through surveillance and enforcement.

#### 1. Amazon's No-Poach Policy.

110. The DSP Operations Manual is, for all practical purposes, binding on DSPs. Upon information and belief, this manual once implicitly barred DSPs from soliciting or hiring one another's drivers.

111. Among other things, Amazon prohibited DSPs from making the first move to recruit an employee from another DSP, and defined the "acceptable" circumstances when DSPs could recruit from their competitors.

---

[11] *See* https://www.reddit.com/r/AmazonDSPDrivers/comments/1bfflyz/how_do_yall_survive_on_these_wages/ (last accessed Aug. 24, 2026).

[12] *Id.*

112. At minimum, DSPs—as well as Amazon's own employees—interpreted the manual to forbid such "poaching."

**2. Amending the Written Policy Did Not Change the Practice.**

113. Amazon eventually amended its written policy and removed the no-poach provision. But, upon information and belief, the practice lives on, as Amazon intended.

114. First-hand accounts confirm so. In January 2024, dozens of United States Senators wrote to Amazon to express their concerns "regarding reports that Amazon inflicts persistent mistreatment on its [DSP] drivers and to request further information regarding Amazon's DSP program."[13] Among other questions, they asked Amazon what its justification was for requiring several DSPS to sign "non-poaching agreements."[14] Amazon responded that it "does not require DSPs to sign 'non-poaching agreements,'" and that it "expressly prohibits" any such efforts.[15] However, as 34 United States Senators bluntly put it: "*this answer contradicts first-hand accounts from several DSPs and DSP drivers*."[16]

115. Furthermore, that Amazon later had to "correct" its own employees' understanding of the policy on inter-DSP driver recruitment underscores how little it did to change the no-poach practice.

116. Amazon's lethargy in eliminating the no-poach practice stands in stark contrast to the alacrity with which it enforces other policies—in particular, DSP drivers' attempts to organize. Amazon uses its control over the relationship with DSPs and DSP drivers to identify and quickly quash any nascent union organizing. When Amazon truly wants to change a practice or enforce a policy, it does so effectively. In contrast, despite Amazon's protestation that it forbids no-poaches, its lackluster enforcement has allowed the practice to continue.

---

[13] *Murphy Leads Bipartisan Group of 29 Senators in Calling Out Amazon's Mistreatment of Delivery Drivers* (Jan. 10, 2024) https://www.murphy.senate.gov/newsroom/press-releases/-murphy-leads-bipartisan-group-of-29-senators-in-calling-out-amazons-mistreatment-of-delivery-drivers.

[14] *Id.*

[15] https://www.murphy.senate.gov/imo/media/doc/amazon_response_to_sen_murphy_dsp_inquiry_feb_2023.pdf.

[16] https://www.murphy.senate.gov/imo/media/doc/final_amazon_dsp_follow-up.pdf.

117. Amazon concealed the existence of the "no poach" policy and practice from DSP drivers. If the State of New Jersey had not initiated its action against Amazon, these policies and practices would have remained concealed. Indeed, in February 2024, Amazon told United States Senators that it "does not require DSPs to sign 'non-poaching agreements,'" and that it "expressly prohibits" any such efforts. Plaintiffs and Class members were not informed that secret "no poach" agreements prevented them from receiving market value for their labor.

**3. The No-Poach Agreement is a Naked Horizontal Restraint Among Competing Employers.**

118. DSPs are separately owned and incorporated businesses that compete with one another to hire and retain drivers. Amazon insists that DSPs, not Amazon, are the drivers' employers and that each DSP makes its own employment decisions. As between DSPs, therefore, an agreement not to solicit or hire one another's drivers is a horizontal agreement among competing employers to allocate a labor market.

119. Amazon organized such agreements and enforced them. Amazon promulgated the no-poach policy, communicated it to DSPs, monitored inter-DSP driver movement to detect deviations, and made adherence a condition of continued participation in the Program. Each DSP adhered knowing that every other DSP was bound by the same term, and each DSP's willingness to forgo recruiting depended on the assurance that its competitors would do the same.

120. The no-poach restraint serves no legitimate procompetitive purpose and is not reasonably necessary to any legitimate collaboration between Amazon and DSPs. Amazon has itself disclaimed any justification for it, representing to the United States Senate that it "expressly prohibits" such agreement.

## VIII. <u>AMAZON HAS MONOPSONY POWER IN THE DSP DRIVERS MARKET.</u>

121. Amazon has restrained the labor market for DSP drivers through its agreements, policies, and practices that inhibit worker mobility and suppress wages.

122. The labor market for DSP drivers (the "DSP Drivers Market") is a relevant antitrust market, and Amazon has monopsony power in that market. Both direct and indirect evidence establish Amazon's market power.

**A. Direct Evidence.**

123. Evidence that Amazon has suppressed prices (wages, rates, fees) or imposed onerous terms or conditions because of a lack of competitive constraints is direct evidence of monopsony power.

124. Here, Amazon's control over DSPs allows it to effectively control DSP drivers' wages and working conditions.

125. Amazon exercises control over DSPs in various ways. It sets DSPs' compensation low and controls their profit margins. It also imposes onerous terms and conditions on DSPs. For example, Amazon can and does terminate DSPs for pretextual or arbitrary reasons, imposes no-poach agreements, and makes it practically impossible for DSPs to serve other customers. Amazon imposes, modifies, and eliminates these terms unilaterally to serve its needs unconstrained by competitive pressures.

126. Amazon enforces its policies through sophisticated monitoring systems, including GPS tracking, in-vehicle artificial intelligence, and cameras surveilling drivers; a network of "business coaches" who "guide" DSPs in implementing Amazon's policies; and surveillance of employee communications outside working hours. These mechanisms enable Amazon to maintain complete control while shifting the legal responsibilities of direct employment to the DSPs.

127. Because of its control over DSPs, Amazon's conduct limits DSPs' ability to compete for drivers through higher wages, more reliable hours, or better working conditions. Amazon effectively limits driver compensation to rates well below competitive levels. It also subjects DSP drivers to worse conditions than they would face if there were significant competition. Amazon's performance requirements impact DSP drivers' compensation and working conditions as well.

128. Amazon is acutely aware of how its policies and actions affect DSP employees. It does not worry that a significant number of drivers will leave for better opportunities; its primary concern is that it will deplete the potential stock of workers willing to endure the low compensation and harsh conditions that Amazon sets with impunity. As a result of Amazon's

monopsony power, DSP drivers receive lower wages and suffer working conditions that are far worse than other delivery jobs such as those offered by FedEx, UPS, and USPS.

**B. Indirect Evidence.**

129. Evidence that Amazon has substantial market share in the relevant market is indirect evidence of monopsony power. In the monopsony context, the relevant market includes the competitive constraints that a buyer faces when purchasing services or labor. It has two components: the types of buyers a seller or worker can provide services to (*i.e.*, the labor market) and the area where sellers can provide their services (*i.e.*, the geographic market).

**1. The DSP Drivers Market is a Relevant Labor Market.**

130. Amazon targets workers with few, if any, viable employment alternatives so that it can maintain its buyer power. DSP drivers lack the qualifications to drive for traditional delivery services like USPS, UPS, and FedEx. If employment with these traditional delivery services were reasonable alternatives for a substantial fraction of DSP drivers, there would not be a significant gap in pay and working conditions. DSPs would lose enough workers to these alternative employers such that imposing low wages and poor working conditions would be unsustainable.

131. Amazon targets workers for whom the number of hours offered (or purchased in the Services Market) is a primary focus. Given that Amazon can guarantee 40-hour work weeks, DSP drivers are unlikely to see jobs with unpredictable hours as reasonable alternatives. Thus, gig work is not a comparable substitute. Upon information and belief, Amazon's own documents show that it does not believe gig work to be a comparable substitute.

**2. The United States is a Relevant Geographic Market.**

132. Amazon's DSP Program is a single, nationally administered program. Amazon imposes the same Program Agreement, Program Policies, Operations Manual, compensation formula, at-will requirement, and no-poach policy and practice on every DSP at every delivery station in the country. Those terms are set centrally and applied uniformly; they are not negotiated station by station or state by state. The conduct alleged here, and its effect on driver compensation, therefore occurred in every locality where Amazon operates a delivery station.

133. Amazon is the only purchaser of DSP drivers' labor in the United States. Because a DSP driver cannot sell that labor to any buyer other than Amazon (through a DSP), and Amazon buys it on identical terms nationwide, the competitive conditions facing DSP drivers are the same nationwide. The DSP Drivers Market is national not because drivers can relocate to alternative buyers, but because the only buyer sets identical terms everywhere and faces no competitive constraints nationwide.

134. Amazon itself treats the DSP workforce as a national workforce. It recruits through a single national job hub, tracks driver movement between DSPs nationally, and, upon information and belief, analyzes DSP labor supply and compensation on a national basis. Amazon also fears that unionization at any one location would spread across the rest of the country, a recognition that the labor market it is protecting is national in scope.

**3. Alternatively, Each State and Each Regional Area in Which Amazon Operates a Delivery Station is a Relevant Geographic Market.**

135. Last-mile delivery is inherently local. DSP drivers must take packages from a delivery station and deliver them locally. DSP drivers simply cannot service a station outside of their DSP's local area, let alone switch their delivery area in response to a small but significant change in compensation or working conditions. Amazon demands last-mile delivery services from each station to nearby customers.

136. To the extent the relevant geographic market is narrower than the United States, each state in which Amazon operates a delivery station, and each Metropolitan Statistical Area ("MSA") or commuting zone containing an Amazon delivery station, is a relevant geographic market. Those regional markets include individual MSAs including the San Francisco Bay Area MSA, where Plaintiff worked. Upon information and belief, Amazon's own management of the DSP Program recognizes these regional groupings: it tracks and manages California-based DSPs and their drivers as a distinct group.

137. Amazon is the only buyer of DSP drivers' labor in the United States and in each regional market within it. Amazon's conduct, its share of the DSP Drivers Market, and its monopsony power are identical in every regional market. The scheme was national, and its effects

were felt in every regional market in the United States. But the same would be true if the geographic market were national. Because Amazon is the only purchaser of DSP labor, it would have monopsony power in any defined geographic market. The scheme was national, and its effects were felt in every regional market in the United States.

**4. Amazon's Market Share in the DSP Drivers Market Establishes Its Market Power.**

138. In the United States, and in each alternative regional geographic market, Amazon's market share in the labor market for DSP drivers is close to 100%.

139. High barriers to entry make it extremely unlikely that a new company will develop a DSP-like system, or that an existing last-mile delivery service provider will expand sufficiently to become a meaningful alternative for DSP drivers. As a result, Amazon is a virtual monopsonist in each relevant geographic market and has a market share far exceeding the threshold for market power.

**5. Alternatively, Amazon's Market Share in the Last-Mile-Delivery-Drivers Market Establishes its Market Power.**

140. Even under a broader labor market definition, which included all last-mile delivery drivers, Amazon would still have buyer market power.

141. Amazon accounts for approximately 30 percent of the packages delivered nationwide, meaning it purchases nearly 30 percent of all delivery drivers' labor nationwide. This percentage is likely higher in regional markets such as California, which has the most fulfillment centers in the country, the highest per-capita income in the country and is heavily urbanized, conditions which correlate with high Amazon Prime membership penetration.

## IX. <u>AMAZON'S CONDUCT HAS ANTICOMPETITIVE EFFECTS.</u>

142. Amazon's multifaceted campaign to improperly maintain its monopsony power has resulted in numerous anticompetitive effects.

143. First, DSP drivers' wages have been artificially constrained below competitive levels (also referred to as "sub-competitive wages").

144. Absent Amazon's anticompetitive conduct, drivers would be allowed to unionize, and wages would increase to a more competitive level. Indeed, after UPS drivers received their Teamsters' membership, they secured higher wages and better working conditions.

145. Amazon's policies and practices with respect to "poaching" have also resulted in sub-competitive wages. Amazon's de facto no-poach policy reduces DSPs' incentives to offer higher wages or better working conditions. If DSPs were incentivized to meaningfully compete with one another—on wages and other forms of compensation, such as health benefits—DSP driver compensation terms would almost certainly improve.

146. Amazon's anticompetitive conduct has also allowed it to subject DSP drivers to sub-competitive working conditions and invasive surveillance, as detailed above.

147. Further, Amazon's conduct has chilled DSP drivers' ability to organize. DSP drivers have declined to engage in union activity because they feared losing their jobs, union supporters have been unable to obtain work at other DSPs, and at least one driver avoided a union rally because she feared retaliation and believed Amazon might terminate her new DSP's contract if organizing resumed.

148. In addition, Amazon's anticompetitive conduct has furthered its ability to unilaterally, and often without notice, set the requirements it imposes upon DSP drivers, such as termination for trivial traffic violations or any other reason, such as attempted unionization. DSP managers know that Amazon can functionally terminate drivers by locking them out of the Flex App, based on rules that Amazon unilaterally sets. In the absence of Amazon's anticompetitive conduct, such draconian working conditions could not persist.

149. Upon information and belief, Amazon's own labor-market analyses show that it continues to pay lower wages than other employers in the market.

## X. <u>CLASS-ACTION ALLEGATIONS</u>

150. Plaintiff brings this action on behalf of himself, and all others similarly situated pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

151. The National Class is defined as follows:

> All persons who worked as DSP drivers in the United States at any point from June 1, 2018 through the present (the "Class Period"). Excluded from the Class are Defendants, their officers and directors, and the Court.

152. A Regional Subclass is defined as follows:

> All Class Members who worked as DSP drivers in a particular region during the Class Period.

153. Subject to additional information obtained through further investigation and discovery, the Class may be modified or narrowed as appropriate.

154. **Numerosity.** Plaintiff does not yet know the exact number of Class members, but he believes they number in the hundreds or thousands. Given the size of Amazon's DSP Program, members are so numerous that joinder is impracticable.

155. **Commonality.** The questions of law or fact common to the Class include but are not limited to: (1) whether Amazon violated Section 1 of the Sherman Act; (2) whether Amazon fraudulently concealed its conduct; (3) whether and the extent to which Amazon's conduct suppressed compensation below competitive levels for Plaintiff and the Class; (4) whether Plaintiff and the Class suffered antitrust injury as a result of Amazon's conduct or were threatened with injury; (5) the type and measure of damages suffered by Plaintiff and the Class; (6) the nature and scope of injunctive relief necessary to restore a competitive market; (7) the difference between the compensation that Plaintiff and the Class received, and the total compensation that they would have received in the absence of the illegal acts, contracts, combinations, and conspiracy alleged.

156. **Typicality.** Plaintiff's claims are typical of those of the Class, because they press the same legal theories and seek to redress the same injuries.

157. **Adequacy.** Plaintiff will fairly and adequately represent the interests of the Class. Plaintiff has no conflict with the interests of the Class. And Plaintiff has retained counsel that is experienced in antitrust litigation and class-action litigation to represent himself and the Class.

158. **Predominance.** The questions of law and fact that are common to the Class predominate over any questions affecting only individual members.

159. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy, especially given the potentially low damages suffered by individual Class members. The prosecution of separate actions by Class members would create a risk of inconsistent rulings or incompatible standards of conduct for Amazon. For example, one court might enjoin Amazon from performing the challenged acts, whereas another might not. In addition, individual actions could be dispositive of the interests of the Class even where certain members were not parties to those actions.

## XI. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Monopsonization of the DSP Drivers Market**
**Violation of Section 2 of the Sherman Act**
**15 U.S.C. § 2**

160. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

161. Amazon has monopsony power in the DSP Drivers Market in the United States and, alternatively, in each regional market alleged above.

162. Amazon has willfully monopsonized the DSP Drivers Markets through a multifaceted scheme that includes the anticompetitive acts described herein. Each of Amazon's actions individually and collectively increased, maintained, or protected its monopsony over the DSP Drivers Market.

163. Amazon's anticompetitive acts include practically preventing DSP drivers from forming unions through various mechanisms, such as the use of contractual provisions that restrict the means necessary to unionization, as well as the use of threats and intimidation. When these anticompetitive efforts are not entirely "successful," Amazon will resort to terminating its business relationship with a DSP or taking adverse action against the drivers who threatened Amazon's monopsony power.

164. Amazon's anticompetitive acts also include its efforts to reduce worker mobility. Amazon's no-poach policy and practice has decreased inter-DSP competition for drivers, which, in turn, has suppressed wages and other forms of compensation and worsened working conditions.

This has helped Amazon to maintain its monopsony power, because it has prevented DSPs from fully competing, and thus eliminated any chance that DSPs could constrain Amazon's monopsony.

165. While each of Amazon's acts is anticompetitive, Amazon's interrelated actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process in the DSP Drivers Market.

**SECOND CLAIM FOR RELIEF**
**Attempted Monopsonization of the Last-Mile-Delivery-Drivers Market**
**(In the Alternative)**
**Violation of Section 2 of the Sherman Act**
**15 U.S.C. § 2**

166. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

167. Amazon has attempted to monopsonize the Last-Mile-Delivery-Drivers Market in the United States.

168. In the alternative, if the relevant market is the Last-Mile-Delivery-Drivers Market in individual MSAs, then Amazon has unlawfully attempted to monopsonize those markets in violation of Section 2 of the Sherman Act.

169. Amazon has willfully attempted to monopsonize the Last-Mile-Delivery-Drivers Market through a multifaceted scheme including the anticompetitive acts described herein.

170. In undertaking this course of conduct, Amazon has acted with specific intent to monopsonize and to destroy competition in the Last-Mile-Delivery-Drivers Market.

171. There is a dangerous probability that, unless restrained, Amazon will succeed in monopsonizing the Last-Mile-Delivery-Drivers Market.

**THIRD CLAIM FOR RELIEF**
**Unreasonable Restraint of Trade — No-Poach Agreement and Related Restraints**
**Violation of Section 1 of the Sherman Act**
**15 U.S.C. §§ 1, 3**

172. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

173. The DSP Drivers Market in the United States and, alternatively, in each regional market alleged above are relevant antitrust markets. Amazon has buyer market power in these markets.

174. Amazon enters into agreements with DSPs, and a core purpose and effect of those agreements is to restrain competition in the DSP Drivers Market. As discussed above, Amazon's agreements with DSPs include anticompetitive terms, including no-poach agreements and terms that hinder drivers' ability to unionize.

175. Upon information and belief, Amazon's agreements and coordinated efforts with DSPs are not all written.

176. Amazon specifically chose to implement a contract and policy-based system with respect to DSPs. Amazon steadfastly claims that DSPs and its drivers are "independent," but as discussed above, Amazon maintains virtually complete control over them. This control is achieved, at least in substantial part, through the agreements and coordinated efforts it executes with respect to DSPs and their drivers, who are captive to Amazon.

177. Amazon enters into contractual agreements with DSPs that require adherence to formal policies and informal practices. Among those policies and practices is a prohibition on soliciting and hiring drivers from other DSPs. Despite public protestations that it prohibits no-poach agreements among DSPs, it in fact demands the opposite. When exactly this restraint began will be revealed in discovery. Amazon's no-poach policy is an agreement for the purposes of Section 1 of the Sherman Act and unreasonably restrains trade.

178. Amazon's anticompetitive agreements have had a cumulative and self-reinforcing effect that has harmed competition, including in the DSP Drivers Market. The agreements unreasonably restrain trade. Amazon's anticompetitive scheme has injured DSP drivers, including both monetary and non-monetary harms.

179. Amazon and the DSPs are separate economic actors with independent interests in the labor market. Amazon has consistently represented that DSPs are independent businesses and the sole employers of their drivers. Agreements between Amazon and the DSPs, among the DSPs through Amazon, are concerted action under Section 1.

180. Amazon's no-poach agreement is a horizontal agreement among competing employers, organized and enforced by Amason, to allocate a labor market by restricting the solicitation and hiring of workers. Such agreements are per se unlawful under Section 1.

181. In the alternative, the no-poach agreement, together with the anti-union terms Amazon requires every DSP to adopt, is an unreasonable restraint of trade under the rule of reason. The DSP Drivers Market in the United States, and alternatively in each regional market alleged above, is a relevant antitrust market; Amazon has buyer market power in each. The restraints imposed by Amazon have suppressed DSP driver compensation and worsened working conditions in those markets without any offsetting procompetitive benefit.

**FOURTH CLAIM FOR RELIEF**
**Violation of California's Cartwright Act**
**(California Subclass)**

182. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

183. As discussed above, Amazon has entered into agreements that unreasonably restrain trade.

184. This unreasonable restraint of trade in the DSP Drivers market violates California's Cartwright Act, California Business and Professions Code §§ 16700–16770.

**FIFTH CLAIM FOR RELIEF**
**Violation of California's Unfair Competition Law**
**(California Subclass)**

185. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

186. Each violation of the antitrust laws by Amazon also constitutes an unlawful and unfair practice in violation of California's Unfair Competition Law (UCL), California Business and Professions Code §§ 17200 *et seq*–.

## XIII. PRAYER FOR RELIEF

187. Plaintiff respectfully requests that this Court, as authorized by statute and its own equitable powers, enter final judgment against Amazon and:

a. Adjudge and decree that this action may be maintained as a class action, with Plaintiff as the designated Class representative and his counsel as Class counsel;

b. Adjudge and decree that Amazon has unlawfully monopsonized the DSP Drivers Market—or, in the alternative, attempted to monopsonize the Last-Mile-Delivery-Drivers Market—in violation of Section 2 of the Sherman Act and California's Unfair Competition Law;

c. Adjudge and decree that Amazon's DSP agreements, no-poach agreements, and other related combinations constitute unreasonable and unlawful restraints of trade in violation of Section 1 of the Sherman Act, California's Cartwright Act, and California's Unfair Competition Law;

d. Enjoin and restrain Amazon, its affiliates, assignees, subsidiaries, successors, and transferees, and its officers, directors, partners, agents and employees, and all other persons acting or claiming to act on Amazon's behalf or in concert with it, from continuing to violate the Sherman Act, California's Cartwright Act, and California's Unfair Competition Law;

e. As needed, enter such relief to remove any ability of Amazon to harm competition by the actions set forth above, including but not limited to structural relief as well as effective, monitorable, and measurable conduct remedies that eliminate the ability of Amazon to continue to reap benefits from their pattern of harm;

f. Appoint a corporate monitor to ensure implementation of all structural or practice remedies ordered by the Court, as well as to ensure that Amazon does not engage in further unlawful conduct, at Amazon's expense;

g. Award to Plaintiff and the Class any other equitable relief as the Court finds appropriate to redress Amazon's violations of the laws specified above and to restore competitive conditions in the markets affected by Amazon's unlawful conduct;

h. Award to Plaintiff and the Class the maximum civil penalties provided by California's Cartwright Act and Unfair Competition Law;

i. Award to Plaintiff and the Class actual damages, punitive damages, treble damages, and any such other relief as provided by the Sherman Act, California's Cartwright Act, and California's Unfair Competition Law;

j. Award pre-judgment and post-judgment interest on such monetary relief;

k. Declare Amazon to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class members;

l. Award to Plaintiff and the Class statutory or equitable disgorgement, restitution, or any other equitable relief for the benefit of DSP drivers, as appropriate under the federal antitrust laws, California's Cartwright Act, and California's Unfair Competition Law;

m. Award to Plaintiff and the Class their costs, including reasonable attorney fees; and

n. Order any additional relief that this Court deems just and proper.

## XIII. DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

DATED: September 7, 2026

Respectfully Submitted,

**SCHNEIDER WALLACE
COTTRELL KIM LLP**

*/s/ Matthew S. Weiler*
Todd M. Schneider (SBN 158253)
Matthew S. Weiler (SBN 236052)
Raymond S. Levine (SBN 348030)
Braden R. Leach (SBN 348871)
2000 Powell Street, Suite 2000
Emeryville, CA 94608
Telephone: (415) 421-7100
tschneider@schneiderwallace.com
mweiler@schneiderwallace.com
rlevine@schneiderwallace.com
bleach@schneiderwallace.com

*Attorneys for Plaintiff and the Proposed Class*